David **EARLY**, Administrator of the Estate of Joshua Early, Deceased; Karen Mullins, Administratrix of the Estate of Timothy Mullins, Deceased; and Bridgett Stivers, Guardian of the Estate of Thomas Blake Stivers, a Minor, Plaintiffs

v.

**TOYOTA MOTOR CORPORATION and Toyota Motor Sales U.S.A., Inc., Defendants**

No. Civ.A. 3:04–45.

United States District Court, E.D. Kentucky. Central Division, Frankfort.

March 29, 2007.

---

David Vaughn Scott, New Albany, IN, Donald R. Forrest, Forrest & Bourne, New Albany, IN, Richard Head, Louisville, KY, William Thomas Donnell, Frost Brown Todd LLC—Louisville, Louisville, KY, for Plaintiffs.

Anne K. Guillory, Woodward, Hobson & Fulton, LLP—Louisville, Louisville, KY, David L. Ayers, Watkins & Eager, PLLC, Jackson, MS, David T. Schaefer, Woodward, Hobson & Fulton, LLP—Louisville, Louisville, KY, for Defendants.

### ORDER

CALDWELL, District Judge.

This matter is before the Court on a Motion to Exclude the Trial Testimony and Opinions of Jay Nogan ("Nogan") filed by Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc., ("Toyota"). [R. 41]. Having considered the written submissions of the parties, the deposition of the proposed expert and having conducted a *Daubert* hearing on the matter, the Court will grant the motion and the testimony of Jay Nogan will be excluded.

### I. Factual Background

The facts in this case are undisputed. On April 26, 2003, both Joshua Early and Timothy Mullins were found dead in a 1994 Toyota extended cab pickup truck at the Kentucky State Welcome Center and Rest Area located on Interstate 64 in Shelby County, Kentucky. Apparently, Early and Mullins had parked there on their way home after a late night out in Louisville, Kentucky. While no one knows how long the truck was parked at the rest area, employees of the Welcome Center observed that the truck's engine had been running for quite some time and that two men appeared to be asleep inside the cabin. At about 1:30 p.m. an employee of the Welcome Center tried to wake the men, but couldn't. Emergency personnel called to the scene determined that Early and Mullins were dead and that the carbon monoxide level inside the truck's passenger compartment was 400 parts per million. An autopsy confirmed that the two men died of carbon monoxide poisoning.

### II. Plaintiffs Claims for Relief

Plaintiffs seek relief on theories of strict liability, negligence and breach of warranty. Specifically, plaintiffs claim that the 1994 Toyota truck was defective due to the selection of material for a dust seal located on the steering column where it passes through the passenger compartment and into the steering control box. Plaintiffs contend that due to the alleged defective material used in the dust seal, it deteriorated and allowed toxic levels of carbon monoxide to enter the passenger compartment. They also claim that Toyota failed to exercise reasonable care in monitoring the field data and other sources of post sale information.[1]

Plaintiffs offer Nogan as an expert in the fields of dust seal design and warning. His opinions are summarized in his report as follows:

1. Toyota knew of the danger of exhaust gases entering the passenger compartment and failed to adequately protect Early and Mullins from carbon monoxide poisoning.

---

1. Although not at issue in this motion, Toyota contends that the dust seal is not part of the exhaust system. Moreover, its experts contend that: (1) the aftermarket modifications of the exhaust system resulted in the leak in the exhaust system; and (2) the subject dust seal was exposed to elevated temperatures due to its exposure to hot exhaust gases coming from this exhaust leak, which in turn caused the deterioration of the dust seal.

2. Toyota failed to use a dust seal that would last throughout the anticipated life of the vehicle, thus allowing engine compartment gases to enter the passenger compartment causing Plaintiffs' deaths.

3. Toyota failed to warn of the need for inspection of the dust seal as part of the vehicle maintenance schedule, thus depriving Early of needed information and opportunity to repair the part.

4. In lieu of an "inspect and replace if needed" maintenance schedule, Toyota failed to specify replacement of the steering column dust seal as a part of scheduled maintenance.

5. Toyota failed to instruct service personnel regarding the critical need for inspection of the steering column as part of the vehicle maintenance schedule.

6. Toyota recognized the need to replace other seals in the steering mechanism and failed to include a critical part like the steering column dust seal. Through its Repair Manual instructions, Toyota requires new seals to be used when work is performed independent of vehicle age.

(R. 41, Exhibit "E," Nogan report). Toyota maintains that Nogan's testimony should be excluded as he is not qualified to testify regarding the above matters and that his work is unreliable and improperly applied to the facts of this case.

## III. Fed.R.Evid. 702

■ In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court established standards for admitting expert opinion testimony under Fed.R.Evid. 702. First, a court must determine whether the expert is qualified to offer opinions in a particular subject area. Once the court determines that an expert is qualified to offer opinions in a particular subject area, it must consider whether the expert's opinion is reliable. In *Daubert,* the Supreme Court suggested that the issue of reliability turns on whether an expert's reasoning or methodology is scientifically valid or whether that reasoning or methodology can be properly applied to the facts in issue. In considering an expert's reliability, trial court's should consider the following:

1. Whether the theory or technique has been tested;

2. Whether the theory or technique has been subjected to peer review;

3. The known or potential rate of error and whether there are standards controlling the technique's operation; and

4. Whether the theory or technique has gained general acceptance in the relevant scientific community.

*Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786.[2] In making reliability determinations, the court's inquiry must be specific to the particular issues in each case. *Kumho Tire,* 526 U.S. at 156, 119 S.Ct.

---

**2.** The Sixth Circuit has also suggested that courts consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." The basis for this inquiry is that it "provides important, objective proof that the research comports with the dictates of good science." *Smelser v. Norfolk Southern Ry. Co.,* 105 F.3d 299, 303 (6th Cir.1997).

1167. In other words, a trial court must decide whether an expert has sufficient specialized knowledge to assist the jury in deciding the issues in the case. Accordingly, an expert's conclusions regarding causation must have a basis in established fact and cannot be premised on subjective beliefs or mere suppositions. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–801 (6th Cir.2000).

## A. The Expert's Qualifications

■ The threshold question for this court is whether Nogan is qualified to offer the particular opinions he has formed in this case. He has been offered as an expert in both the areas of design defects and warnings. The Court concludes that he is not qualified to offer opinions on either subject.

As to the alleged design defect, Nogan's Curriculum Vitae and testimony reflect that he holds a degree in mechanical engineering. However, as he testified at the *Daubert* hearing, he does not hold an engineering license in any state; he does not have any particularized experience in automotive design or manufacturing; and he has no experience in designing, installing, or researching any kind of automotive engine seal. Moreover, Nogan, has never worked on any cases in which the dust seals or longevity of rubber was at issue in an automotive carbon monoxide poisoning case or any other case in which dust seal composition and longevity was at issue. Further, Nogan is not a polymer scientist. He has no independent knowledge of the chemical composition of the dust seal in question and his background in rubber and rubber products is derived largely from his employment experience at HPS, a small company that manufactured hydraulic components, electrical components, and a series of traffic waterways used on fire trucks. He worked at HPS for eight years and received on-the-job training regarding the installation and servicing of seals in varied mechanical applications. However, Nogan's testimony suggests that this training was largely focused on familiarizing himself with the HPS product line and identifying the product best suiting the HPS customer's needs. Nogan testified that during his employment at HPS, he came to use and rely on Military Handbook 695 and the Parker O–Ring Guide as sources of information regarding storage conditions and the shelf like of various polymer seals.

As to the issue of warnings, Nogan's experience does not suggest that he has the requisite expertise to offer opinions to the jury. He has neither written nor reviewed any owners manuals or repair manuals for any product, much less an automotive product. He has never prepared a maintenance schedule for any NBR seal, including the one in this case. Likewise, Nogan does not profess to be a warnings or human factors expert.

Put simply, nothing in Nogan's educational or professional background qualifies him as an expert regarding either design defects or warnings. However, even if Nogan were qualified to offer an expert opinion as to the issues in this case, this Court finds that his opinions are not reliable based on the work he as performed in this case.

## B. Reliability of the Expert's Opinion Regarding the Alleged Design Defect

■ If a court determines that an expert is qualified to offer opinions in a particular field, the Court must then decide whether the opinion is reliable. Thus, assuming that Nogan is qualified to offer expert testimony in the area of design defects, the Court finds that his opinions

related to the design of the dust seal are unreliable in this case.[3]

At the time Mr. Nogan examined the dust seal, it had already been removed from the 1994 Toyota pick-up. Therefore, he had not opportunity to observe the dust seal as it had been originally installed on the steering column in the subject truck. He observed that the seal was torn, but made no effort to ascertain the cause of the tear. Nogan conceded that a front-end collision could have damaged the dust seal and*or the steering column on which it was located. However, in forming his opinions in this case, Nogan did not consider that the vehicle had been involved in a front-end impact collision prior to April 2003.

Nogan testified that he was unfamiliar with the particular composition of the subject dust seal and further stated that the seal taken from the Early vehicle is the only one of its kind he has ever examined. Despite his lack of familiarity with the particular seal and his failure to examine service or maintenance records, Nogan concluded that the seal appeared to be original equipment. He formed this opinion without having ever examined an exemplar vehicle or an exemplar dust seal.

As to the composition of the dust seal, Nogan admitted that he had not run any tests or conducted any research that would enable him to determine whether an alternative composite for the dust seal would have performed better. Nogan testified that in determining the kinds of seals that should be used in various mechanical engi-neering applications, one should consider the fluids or materials being sealed, the operating temperature of the mechanical component, and the anticipated life span of the seal. However, in this case, Mr. Nogan didn't consider anything other than the recommended shelf life of various polymer seals as referenced in a military handbook. Stunningly, he arrived at this conclusion without even knowing the precise composition of the dust seal or its purpose in the mechanical operation of the Toyota pick-up.

Nogan admitted that overheating and other stressors could have damaged the seal, but did not conduct or commission any kind of finite element analysis that would enable him to discern whether any excessive force beyond normal stressors were applied to the dust seal during its life in the vehicle. He admitted that he had no idea as to the normal operating temperature in the area of the dust seal, but maintained that the seal had not been overheated.[4]

Nogan also admitted that in formulating his original opinion in the case, he did not offer any alternative design for the dust seal. Moreover, he admitted that he had not run any experiments or test to determine whether some alternative would have performed better under any set of conditions.

At the end of the day, this expert looked at the seal, noted that it had a tear, and without any testing, concluded that it had not been damaged by heat. He failed to

---

**3.** In pleadings and at the *Daubert* hearing, defendants have criticized Nogan's failure to perform a detailed examination of the truck's exhaust system. However, the Court finds that such an inspection might not be necessary in this case as it is undisputed that the carbon monoxide leak occurred in the exhaust system, which had been modified by the vehicle owner.

**4.** Although this error doesn't go directly to the aspect of scientific analysis, it is telling the Mr. Nogan didn't even correctly measure the distance between the seal and the breach in the exhaust system.

consider any abnormal engine stressors including a front-end collision that may have adversely affected the performance of the dust seal. Without knowing the history of the vehicle or precise composition of the dust seal in question, Nogan simply consulted a military reference book regarding the relative shelf life of military polymer seals to conclude that Toyota should have used another polymer compound in designing the seal. Yet, he offers no alternative.

Even if Nogan were qualified to give an opinion regarding the alleged design defect of the Toyota dust seal, his opinions are completely without any kind of scientific validity. In considering his work and opinions in the light most favorable to the plaintiffs, this expert's opinion does not pass muster under a single *Daubert* criterion.

### C. Reliability of Expert's Opinion on Warnings

At the *Daubert* hearing, it was unclear to the court as to whether Plaintiffs would offer Nogan as an expert on the issue of warnings. To avoid any possible confusion as the case moves forward, the Court finds that Mr. Nogan is not qualified to offer an opinion on warnings. In fact, Mr. Nolan essentially conceded that he has no particular training or experience that would render him qualified to render an opinion in this case.

Even if he were qualified, however, his opinions are unreliable in that they have no basis in fact. Nolan never requested or reviewed the complete owners manual for the 1994 pick-up in question nor did he have any knowledge of the operator's familiarity with the manual. In review of the manual, which consisted of 20 pages, Nolan didn't take into account any of the warnings and instructions regarding maintenance of the exhaust sys-

tem. Nor did he consider the warning not to remain for long periods of time in a parked vehicle with the engine running. Nolan also opined that the dust seal should be replaced in routine maintenance, but his opinion is not supported by scientific research or testing. Nolan also acknowledges that information regarding the dust seal is contained in the Toyota repair manual. He merely suggests that the repair information isn't specific enough. Once again, he doesn't rely on any data or scientific studies in forming his opinions or the issue of warnings.

### D. Conclusion

For the reasons stated above, the Court finds that Plaintiffs' expert on the issues of design defects and warnings is not sufficiently qualified to testify as an expert at trial. Even assuming, however, that he is qualified, his opinions are not reliable. His reasoning is not supported by any scientific or engineering methodology. His opinions have not been peer reviewed or published and he has not even attempted to eliminate other causes for the alleged failure for the dust seal in this case. Put simply, the experts opinions are not reliable as they do not comport with the dictates of good science under *Daubert* or *Kumho Tire*.

WHEREFORE, it is hereby ordered:
1. Defendant's motion to exclude Jay Nogan's testimony at trial [R. 41] is hereby GRANTED.
2. Having excluded Nogan's testimony, the Court will deny plaintiff's motion for additional time for expert evaluation of exemplar vehicles [R. 56] as both untimely and moot.
3. Toyota's Motion for Protective Order [R. 33] is hereby denied as moot.